**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **THERESA C. HERD,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **No. 3:11-CV-2847-N** |
| | § | |
| **COMMISSIONER OF THE** | § | |
| **SOCIAL SECURITY ADMINISTRATION,** | § | |
| **Defendant.** | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

This is an appeal from the decision of the Commissioner of the Social Security Administration ("the Commissioner") denying the claim of Theresa C. Herd ("Plaintiff") for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"). The Court considered Plaintiff's Brief, Defendant's Brief, and Plaintiff's Reply Brief. The Court reviewed the record in connection with the pleadings. The court recommends that the final decision of the Commissioner be reversed and remanded for further proceedings.

**Background**[1]

**Procedural History**

Plaintiff filed an application for a period of disability and disability insurance benefits on November 21, 2008. (Tr. 73, 132-33.) The Commissioner denied Plaintiff's disability application at the initial and reconsideration levels. (Tr. 73-74.) Plaintiff requested a hearing before an administrative law judge ("ALJ"). (Tr. 87-88.) A hearing was held before ALJ Michael E. Finnie

---

[1] The following background facts are taken from the transcript of the administrative proceedings, which is designated as "Tr."

on September 2, 2009.  (Tr.  36-72.)  Plaintiff testified, as did a vocational expert ("VE").  The ALJ

did not call a Medical Expert ("ME") to testify.

The ALJ issued an unfavorable decision on March 26, 2010.  (Tr. 22-23.)  He found that

Plaintiff retained the residual functional capacity ("RFC") to perform a reduced range of medium

work.  (Tr. 26.)[2]  Plaintiff filed a request for review of the ALJ's decision by the Appeals Council and

submitted additional medical evidence and a statement from Plaintiff's treating psychologist, Gregg

D'Angelo, but the Appeals Council denied review on September 8, 2010.  (Tr. 1-6.)  Thus the ALJ's

decision became the final decision, from which Plaintiff now seeks judicial review pursuant to 42

U.S.C. § 405(g).

### Plaintiff's Age, Education, and Work Experience

Plaintiff was born on March 31, 1962, and was 44 years old on her alleged disability onset

date.  (Tr. 31, 132.)  Thus, Plaintiff was a "younger individual" during the relevant period.  20 C.F.R.

§ 404.1563(c) (2011).  Plaintiff attended school through the 9th grade, earned a general equivalency

diploma ("GED"), and attended college for approximately two years.  (Tr. 31, 160.)  According to

the VE who testified at the hearing, her work experience included employment as an apartment

manager, property manager, and retail store manager.  (Tr. 31, 66, 156-58, 190-94.)

### Plaintiff's Medical Evidence[3]

Plaintiff advised the Social Security Administration that she has anxiety and panic attacks and

memory problems.  (Tr. 156, 189.)  She sleeps very little and has nightmares.  (Tr. 164, 189.)  She

---

[2]Medium work involves lifting no more than 50 pounds at a time, with frequent lifting or carrying of objects weighing up to 25 pounds.  20 C.F.R. § 404.1567(c).  A person who can perform medium work can also perform light and sedentary work.  *Id.*

[3]This summary of the medical evidence was provided by Plaintiff.  (Pl.'s Br. at 3-12.)

loses track of time and is tired and depressed.  (Tr. 165.)  She has difficulty maintaining attention.  (Tr. 166.)  She is forgetful and becomes confused.  (Tr. 167, 170.)  She also reported experiencing nausea and severe headaches.  (Tr. 183, 185.)  She cannot concentrate or focus for extended periods of time and has difficulty working around others.  She also complains of mood swings.  (Tr. 212.)  She performs activities at a slow pace.  (Tr. 215.)

Dr. Michael Caruso, a psychologist, evaluated Plaintiff on November 10, 2006, following an incident on October 27, 2006, when she tried to assist a young male shooting victim.  (Tr. 228-231.)  She realized that the top of his head had been shot off.  She went into shock, followed by periods of unreality, losing track of time and becoming easily startled.  She began to have intrusive recall, flashbacks, outbursts of uncontrollable crying and anger. (Tr. 228.) She also experienced anxiety attacks.  (*Id*.)  Plaintiff related to Dr. Caruso that in 1991, her husband threatened to commit suicide.  They fought for control of the gun and her husband fled to a room where he shot himself.  (Tr. 230.)  She further reported that she had been abused as a teenager and had had incidents of dangerous confrontations with apartment residents, as part of her job.  (*Id.*)  Dr. Caruso noted evident anxiety and depression, as well as pressured speech.  Plaintiff reported that her sleep was interrupted and she had reduced energy.  (*Id.*)

A primary care physician. Dr. Worrell, diagnosed cephalgia and acute and delayed PTSD-chronic. (Tr. 269-71.) Plaintiff reported symptoms of vomiting, sleep disturbance, twitching, stress, and diarrhea.  (Tr. 271.)  Dr. Worrell prescribed Xanax.  (Tr. 272, 274.)

A psychiatrist, Dr. Howard Cohen, conducted an independent medical examination on June 3, 2008.  (Tr. 281-285.)   Plaintiff described the traumatic incident in 2006, which brought back memories of her husband's suicide.  She described various medications which had been prescribed

3

and her symptoms of posttraumatic stress, anxiety and depression, panic attacks, a 70-pound weight loss, insomnia, difficulties with memory and concentration, nightmares, suicidal thoughts, and heightened startle response. She also described paranoid thoughts and obsessive hand washing. (Tr. 281.) Plaintiff also described having a constant headache since the time of the trauma. (Tr. 282.) Dr. Cohen noted a depressed and anxious mood. Plaintiff also had significant myofascial trigger points. Dr. Cohen diagnosed severe major depressive disorder, with intermittent passive suicidal ideation and mild paranoia; posttraumatic stress disorder; panic disorder; obsessive-compulsive symptoms; chronic daily headaches; and cervical and trapezius myofascial pain syndrome. He indicated that Plaintiff has a typical syndrome of severe depression, PTSD, and comorbid anxiety symptoms with secondary somatic symptoms related to anxiety. (Tr. 283.) He found "no evidence whatsoever of factitious disorder or malingering." (Tr. 284.) He recommended a program to include medication, biofeedback, trigger point injections, and psychiatric care. (Tr. 284-285.) Such a program would be expected to result in significant improvement. (Tr. 285.) He spoke with her treating psychologist, Dr. Gregg D'Angelo, and they agreed that it would be imperative for her to continue psychotherapy with Dr. D'Angelo and pharmacotherapy with Dr. Cohen. (Tr. 279.)

Dr. D'Angelo evaluated Plaintiff on July 26, 2007. (Tr. 287-292.) He noted that she spoke in a strident manner. At times, she was tangential to the topic. She also seemed somewhat self-distracted and frequently expressed frustration with her performance. She occasionally expressed anger and started to cry when discussing her difficulties. (Tr. 289.) An MMPI-2 was administered and was deemed valid and consistent with PTSD. Plaintiff demonstrated a significant weakness on a subtest involving single digit immediate memory, felt to most likely reflect concentration difficulties secondary to emotional distress. (Tr. 290-291.) Dr. D'Angelo felt that Plaintiff's most

4

substantial obstacle to employment was likely to be her substantial emotional distress.  (*Id.*)   The diagnosis was acute PTSD with a global assessment of functioning ("GAF") of 55.  Pursuant to American Psychiatric Association criteria, such a score indicates moderate symptoms, or moderate impairment in social, occupational, or school functioning.[4]  (Tr. 292.)

Progress notes of Dr. D'Angelo indicate that Plaintiff continued to experience depression, anxiety, insomnia, and headaches despite treatment, although her symptoms were slightly less severe. (Tr. 293, 334-335.)  Treatment records indicate that she continued to experience sleep disturbance, depressed mood, anxiety, panic attacks, and nightmares.  (Tr. 329, 326, 295.)

A state agency medical consultant ("SAMC"), Dr. Leela Reddy, determined that Plaintiff had an anxiety-related disorder of PTSD, but that this produced only mild restriction of activities of daily living, social functioning, concentration, persistence or pace.  Further, it had caused no episodes of decompensation.  (Tr. 357, 362, 367.)  However, on a mental RFC questionnaire, Dr. Reddy reported that Plaintiff's impairment resulted in moderate limitations in eight categories: (1) the ability to understand and remember detailed instructions; (2) the ability to carry out detailed instructions; (3) the ability to maintain attention and concentration for extended periods; (4) the ability to perform activities within a schedule, maintain regular attendance and be punctual with customary tolerances; (5) the ability to work in coordination or proximity to others without being distracted by them; (6) the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; (7) the ability to interact appropriately with the general public; and (8) the ability to get

---

[4] A GAF score represents a clinician's judgment of an individual's overall level of functioning. *See* AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed. text rev. 2000) (DSM).

along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 371-372.)

In May 2009, Plaintiff was examined by Dr. Brian Skop, a psychiatrist, at the request of an insurance company. (Tr. 388-403.) Dr. Skop reviewed Plaintiff's therapy records and prior evaluations, including an evaluation by Dr. Audrey Stein Goldings in January 2009, in which Plaintiff was found to have severe anxiety on the Beck Anxiety Inventory.[5] (Tr. 392.) When Dr. Skop administered the Beck Depression Inventory and BAI in May, 2009, Plaintiff's scores indicated extreme depression and severe anxiety. (Tr. 396.) An MMPI-2 was marginally valid, with validity scales suggesting symptom exaggeration. It was noted that this could have been due to the examinee experiencing distress at the time of test-taking, a cry for help, severe psychopathology, or an attempt to make herself look worse than she actually was. (Tr. 396, 402.) The profile suggested problems with anger and anger control. Dr. Skop concluded that Plaintiff may be prone to destroy property and to hurt others. The scale elevations suggested risks in any potential environment, including the workplace. (Tr. 397.) Plaintiff endorsed a number of items indicative of suicidal risk, or risk of hurting others. (Tr. 398.) Dr. Skop noted that Plaintiff's presentation, psychological testing, and history are suggestive of a personality disorder with Cluster B (antisocial, narcissistic, borderline, and histrionic) traits. (*Id*.) He suggested the avoidance of potentially addictive medications, given her history of alcohol and marijuana use. (*Id*.)

---

[5] The Beck Anxiety Inventory ("BAI"), created by Dr. Aaron T. Beck and other colleagues, is a 21-question multiple-choice self-report inventory that is used for measuring the severity of an individual's anxiety. The BAI was specifically designed as "an inventory for measuring clinical anxiety" that minimizes the overlap between depression and anxiety scales.

Dr. Skop diagnosed PTSD, major depressive disorder, and personality disorder NOS (not otherwise specified). (Tr. 399.)  He found no objective evidence of functional improvement through treatment, noting that the Beck depression and anxiety inventories were significantly worse than when Plaintiff presented for treatment.  (*Id.*)

Dr. Skop advised that Plaintiff is continuing to report extreme symptoms and psychosocial impairment and there is no substantial evidence that she is responding to the current treatment or that she is making objective improvement through treatment.  Her Beck Depression Inventory and Beck Anxiety Inventory were significantly worse than they were when she was initially diagnosed.  Neither was she describing significant functional improvement.  (Tr. 399-400.)

Dr. D'Angelo reevaluated Plaintiff on April 28, 2009.  (Tr. 413-416.)  He also noted inconsistent responses to the MMPI-2, which could reflect conscious exaggeration, poor interpretation of the test items, or feeling overwhelmed by emotional distress.  Plaintiff endorsed items suggesting frequent physical difficulties as well as significant depression and anxiety, with responses indicating that she is likely to be quite fearful and apprehensive across a variety of circumstances.  She also endorsed items suggesting that she is often irritable and prone to occasional angry verbal outbursts.  She appeared to perceive that she has little control over her emotional responses. (Tr. 415.) Dr. D'Angelo's impression was that Plaintiff continued to experience moderate to severe depression and anxiety, as well as associated physical symptoms.  (*Id.*)  According to Dr. D'Angelo she was strongly in need of continued psychotherapy.   The diagnoses were chronic posttraumatic stress disorder, severe major depression without psychotic features, and psychological factors affecting medical condition.  Her cureent GAF score was 60.  (Tr. 416.)

Plaintiff was also examined by George R. Mount, Ph.D., a clinical psychologist, on September 30, 2009. (Tr. 436-454.) Dr. Mount found Plaintiff to be depressed and anxious. She demonstrated memory deficits. He administered the Million Clinical Multiaxial Inventory (MCMI) and found that Plaintiff's mental status was consistent with the testing in that she was depressed, anxious, and appeared to have a personality disorder. Testing suggested a schizoaffective disorder, depressed type. She achieved scores indicating severe depression and anxiety on the Beck inventories and a positive score on the Posttraumatic Stress Disorder Checklist for Civilians. Dr. Mount diagnosed schizoaffective disorder, depressed type; generalized anxiety disorder; and chronic PTSD. He also provisionally diagnosed a schizoid personality disorder. He opined that her GAF score was 40. (Tr. 438.) Pursuant to American Psychiatric Association criteria, such a score indicates some impairment in reality testing or communication, or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. Examples given are of a depressed individual who avoids friends, neglects family, and is unable to work.[6]

In a medical source statement, Dr. Mount found Plaintiff to be markedly limited[7] in the ability to understand, remember, and carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and to be punctual within customary tolerances; sustain an ordinary routine without special supervision; to work in coordination with or proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically based symptoms and

---

[6]*See* American Psychiatric Association, <u>DSM-IV</u>, *Id.*

[7]"Markedly limited" was defined as "effectively precludes the individual from performing activity in a meaningful manner." (Tr. 450.)

perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and to respond appropriately to changes in the work setting. (Tr. 451-453.) He answered affirmatively to the question as to whether Plaintiff experiences episodes of deterioration or decompensation in work or work-like settings which would cause her to withdraw from that situation and/or experience exacerbation of symptoms. (Tr. 453.) He opined that she was not a malingerer; found her to be incapable of performing even "low stress" jobs; and opined that she would likely be absent from work, due to her impairments or treatment, more than three times per month. (Tr. 454-455.)

Five days later, on October 5, 2009, Plaintiff was evaluated by Gerald H. Stephenson, Ph.D., a consultative psychologist. (Tr. 457-468.) Dr. Stephenson reviewed the previous evidence (although it does not appear that Dr. Mount's report was made available to him). He noted that the records include an MMPI-2 profile with elevated scales, which an evaluator had concluded made the clinical scales unreliable. He acknowledged that the elevated F scale indicated exaggerated focus on pathology but remarked that this often reflects a cry for help. (Tr. 457.) At the time Plaintiff took that test, she was being refused treatment by the workers' compensation carrier. (Tr. 457-458.) Dr. Stephenson stated: "To do a blind read of a test has never seemed to be useful, since it ignores the person being tested and the circumstances of the test. Human beings are complex, and psychological tests, while useful, cannot be taken as complete definitions of the person." (Tr. 458.)

Plaintiff told Dr. Stephenson that she rarely leaves her house, although she can go across the street to Albertson's to shop for groceries. She doesn't socialize or see her friends because her

9

friends become uncomfortable with her, and she becomes agitated.  Plaintiff reported that they tell her that she is not the same person she used to be and she doesn't know how to deal with them.  (Tr. 460.)  She also reported forgetfulness, lapses of concentration, and episodes of rage.  (*Id.*)  Plaintiff's mood was described as "dysphoric with agitation as well as much weeping."  (Tr. 462.)  She demonstrated average or below average immediate recall; recalled only one of three words after three minutes; and failed to mentally add 23 and 32.  (*Id.*)  On the WAIS, her full-scale IQ of 91 was at the 27th percentile, on the low side of average.  Dr. Stephenson suspected that she scored lower than her former mental capacity, most likely due to her depressed mood and other PTSD symptoms.  Processing speed score was in the borderline range, reflecting a general slowdown in perceptual-motor performance.  (Tr. 463.)  Her arithmetic score was at the 8th percentile on the WRAT.  (Tr. 464.)

Dr. Stephenson diagnosed posttraumatic stress disorder; and major depressive disorder, severe, without psychosis but with suicidal ideation.  He opined that her GAF was 55-60 at present, with continued treatment.  (*Id.*)

Dr. Stephenson prepared a medical source statement, in which he estimated that Plaintiff would have marked limitations[8] in the ability to understand, remember, and carry out detailed instructions; and to interact appropriately with the general public, supervisors, and co-workers.  (Tr. 466-467.)  He found her to have an extreme limitation[9] in her ability to respond appropriately to work pressures in a usual work situation and to changes in a routine work setting.  (Tr. 467.)

---

[8]"Marked" was defined as "[t]here are serious limitations in this area.  There is a substantial loss in the ability to effectively function."  (Tr. 466.)

[9]"Extreme" was defined as "[t]here are major limitations in this area.  There is no useful ability to perform in this area."  (Tr. 466.)

10

**The Hearing**

**Plaintiff's Testimony at the Hearing**

At the hearing, Plaintiff testified that she gets very emotional, becomes scared, is forgetful, cannot keep things organized, and gets confused. Her antidepressants make her slower but she is able to sleep for three to five hours with them. (Tr. 45-46.) She does not want to be around people, does not see her friends, and does not sleep well. She has difficulty focusing and remembering tasks. She related an incident in which she was filling a small pool and left the water running in the garden hose, causing a flood in her lawn and her neighbor's lawn. (Tr. 47.) She forgets how to get to places. Other people drive her to her doctor's appointments. (Tr. 48-49.) Her husband picks out her clothes and supervises her taking her medications. (Tr. 49.) He cuts her hair because she does not like going to salons. She spends a lot of time in her garden, and because she is scared, her husband has put big chains on the fence. (Tr. 50.) She is scared that someone could be in the front yard, and she looks out through the blinds to see if someone is in the front yard. She does this day and night. (Tr. 53-54.) She wakes up in the middle of the night and checks the checking account, to reassure herself that there is money in the account. She is scared that there is no money. (Tr. 52-53.) Her husband pays the bills and grocery shops with her. (Tr. 52-53, 60.) She puts the clothes in the washer and forgets that she has done so, or will clean a room and forget that she has done so. (Tr. 56-57, 62.) She watches the same TV shows over and over. (Tr. 63.) While she enjoys reading histories, she re-reads books over and over because she does not remember what she has read. (Tr. 57, 61.) She has left

11

her wallet in a store and has lost her car in a parking lot. (*Id.*) She does not trust her judgment, and she starts crying or gets violent when she gets emotional. (Tr. 62-63.) She said that she would cry or get angry if a supervisor criticized her. She believed that if she became angry, she could hurt someone. For that reason, her grandson no longer lives with her. (Tr. 63.)

Plaintiff sees her psychiatrist, Dr. Cohen, every three to four months. (Tr. 64.) All of her doctors were chosen by the insurance company or by the Texas Workforce Commission. (Tr. 65.)

### The VE's Testimony at the Hearing

Dr. Anderson, the VE, identified Plaintiff's past work as light in exertion and skilled. (Tr. 66.) In response to a hypothetical question posed by the ALJ which assumed the capacity for simple, routine tasks consistent with unskilled work, with no more than occasional contact with the general public, Dr. Anderson identified jobs which could be performed as a cleaner/housekeeper, laundry folding machine operator, or office mailing collator operator. (Tr. 67-68.) However, he stated that if an individual could not maintain an emotionally stable manner to complete a workday or workweek without interruptions or unscheduled absences or rest periods away from the work area, that would eliminate competitive work. (Tr. 68.) Further, a moderate limitation in the ability to perform activities within a schedule and maintain regular attendance would preclude performance of any substantial, gainful employment. (Tr. 69.)

### The ALJ's Decision

The ALJ found that Plaintiff has severe impairments of schizoaffective disorder, generalized anxiety disorder, and posttraumatic stress disorder. (Tr. 24, Finding No. 4.) These cause moderate limitations in social functioning and in maintaining concentration, persistence, or pace, but do not meet or equal in severity the requirements of any impairment listed in the Commissioner's Appendix

1 (the "Listing of Impairments").  (Tr. 25, Finding No. 4.)  He found that Plaintiff has no physical

limitations but is limited to work "that requires only simple routine tasks, and the claimant is limited

to work that requires no more than occasional contact with the general public and coworkers."  (Tr.

26, Finding No. 5, emphasis in original.)  She is unable to perform her past work (Tr. 31, Finding No.

6), but she can perform jobs that exist in significant numbers in the economy.  These other jobs

include the jobs of cleaner, housekeeping; laundry folding machine operator; and office mail collator

operator, as identified by the VE.  (Tr. 31-32, Finding No. 10.)  Hence, the ALJ found that Plaintiff

was not disabled.  (Tr. 32, Finding No. 11.)

## Standard of Review

To be entitled to social security benefits, a plaintiff must prove that she is disabled for

purposes of the Social Security Act.  *Leggett v. Chater*, 67 F.3d 558, 563–64 (5th Cir. 1995); *Abshire*

*v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988).  The definition of disability under the Social Security

Act is "the inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which has

lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §

423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is

disabled.  Those steps are:

1.  An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.  An individual who does not have a "severe impairment" will not be found to be disabled.

3.  An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

13

4. If an individual is capable of performing the work the individual has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes her from performing her past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the inquiry, the burden lies with the claimant to prove her disability.

*Leggett*, 67 F.3d at 564. The inquiry terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

The Commissioner's determination is afforded great deference. *Leggett*, 67 F.3d at 564. Judicial review of the Commissioner's findings is limited to whether the decision to deny benefits is supported by substantial evidence and to whether the proper legal standard was utilized. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C.A. § 405(g). Substantial evidence is defined as "that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett*, 67 F.3d at 564. The reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. However, "[t]he ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council." *Newton v. Apfel*, 209 F.3d 448, 455

14

(5th Cir. 2000).  Moreover, the terms of 20 C.F.R. § 404.1527 define "medical opinions" and instruct

claimants how the Commissioner will consider the opinions.[10]  In the Fifth Circuit, "the opinion of

the treating physician who is familiar with the claimant's impairments, treatments and responses,

should be accorded great weight in determining disability." *Newton*, 209 F.3d 448, 455 (5th Cir.

2000); *see Floyd v. Bowen,* 833 F.2d 529, 531 (5th Cir.1987).

### Plaintiff Sets Forth the Following Issues

1.      Did the Commissioner properly consider the issue of presumptive disability
        pursuant to the Commissioner's "Listing of Impairments"?

2.      Did the Commissioner properly evaluate expert medical opinion evidence as
        to Plaintiff's functional limitations?

3.      Having found that Plaintiff cannot return to her past relevant work, did the
        Commissioner carried his burden at Step 5 of the sequential evaluation by
        establishing the existence of work she can perform commensurate with her
        residual functional capacity?

### Analysis

### The ALJ's Evaluation of the  Medical Evidence
### with respect to Plaintiff's Functional Limitations

Among other arguments, Plaintiff asserts that the ALJ erroneously discounted medical

opinion evidence from Plaintiff's treating and examining psychologists.  (Pl.'s Br.  17-21.)  The

---

[10]  The terms of 20 C.F.R. § 404.1527(a)(2) provide:

(2) Evidence that you submit or that we obtain may contain medical opinions. Medical
opinions are statements from physicians and psychologists or other acceptable medical
sources that reflect judgments about the nature and severity of your impairment(s), including
your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and
your physical or mental restrictions.

Commissioner responds that the treatment records generally support, rather than detract from, the ALJ's disability determination. The Commissioner further states that Plaintiff is merely asking the Court to reweigh the evidence. Plaintiff's argument has merit and requires remand. In light of this finding, the Court does not reach Plaintiff's remaining issues.

When determining a claimant's residual functional capacity, an ALJ must consider all of a claimant's medically determinable impairments, including those that are not severe. 20 C.F.R. §§ 404.1545(a)(2), 404.1545(e), 416.945(a)(2), 416.945(e). A medically determinable impairment is one that is "demonstrated by 'medically acceptable clinical and laboratory diagnostic techniques.'" *Greenspan v. Shalala*, 38 F.3d 232, 239 (5th Cir.1994) (quoting 42 U.S.C. § 423(d)(3)). "A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with . . . other substantial evidence.'" *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir.2000) (quoting *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir.1995)). "[A]bsent reliable medical evidence from a treating or examining physician controverting [a] claimant's treating specialist, an ALJ may reject the opinion of [a] treating physician *only* if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth" in the regulations governing Social Security claims. *Id.* at 453.

Further, the ALJ must consider the entire record and cannot "pick and choose" only the evidence that supports his position. *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000). "The [proper] inquiry [] is whether the record, read as a whole, yields such evidence as would allow a reasonable mind to accept the conclusions reached by the ALJ." *Id.*

In this case, the ALJ found that Plaintiff had the RFC to perform the full range of physical work as defined in 20 C.F.R.(c) except: the claimant is limited to work that requires only simple routine tasks, and the claimant is limited to work that requires no more than occasional contact with the general public and coworkers. (Tr. 26.)  When assessing Plaintiff's residual functional capacity ("RFC") the ALJ stated, "There is objective evidence of record that indicates the claimant's mental disorders are not as limiting as alleged. . . During a neuropsychological evaluation, Dr.  D'Angelo [Plaintiff's treating psychotherapist] found the claimant's comprehension of instructions was adequate without repetition or simplification, and that the claimant's attention was good most of the day." (Tr. 27, 289.) Substantial evidence does not support this conclusion.  In a letter to the Appeals Council written after Dr. D'Angelo had read the ALJ's decision, a letter which is now a part of the record before this Court for review, Dr. D'Angelo pointed out that the ALJ had taken the statements regarding adequate comprehension of instructions and good attention "out of context" because they referred to behavioral observations of Plaintiff's presentation during the structured assessment.  (Tr. 485.)  Dr. D'Angelo noted that test data revealed deficits in concentration and in speed of processing information.  (*Id.*)  He also commented that the ALJ's comments that the MMPI suggested a possible exaggerated view of her emotional and behavioral difficulties was also taken out of context "as other portions of this paragraph indicate that the validity scale profile also is often seen in persons who are feeling overwhelmed with emotional distress.  Persons experiencing substantial emotional and mental health difficulties often produce similar validity configurations on the MMPI-2." (*Id.*)

Dr. D'Angelo also noted that the ALJ had referenced Dr.  D'Angelo's statement at one point that Ms. Herd was "coping well."  (*Id.*)  Dr.  D'Angelo explained that instances of improved and diminished coping over the course of a long illness are quite common and the phrase could reflect

17

a relative improvement from a prior low level of mental health functioning. (*Id.*) The Social Security Administration has acknowledged, in promulgating the mental impairments listings, that occasional symptom-free periods and sporadic ability to hold a job are not inconsistent with, but rather are symptomatic of, a claimant's disability.  *See Poulin v. Bowen*, 817 F.2d 865, 875- 76 (D.C. Cir. 1987).  Thus, the ALJ's picking of evidence chosen to reflect unfavorably on Plaintiff's claims resulted in findings that contradicted the Commissioner's acknowledgment of the ebb and flow of long term mental health illnesses.

Dr. D'Angelo also disagreed with the ALJ's statement that a GAF score of 60 is borderline with mild symptoms.  The doctor indicated to the Appeals Council that a score of 60 does not indicate a borderline finding.  Rather, it should be interpreted as in the moderate range (Tr. 486-487).  He rejected the ALJ's statement that the Plaintiff had mild to moderate difficulty in adaptation (Tr. 486).

Dr. D'Angelo's treatment records were not the only ones that the ALJ either failed to review carefully or did not understand, in finding that Plaintiff's mental disorders were not as limiting as alleged.  Dr. George R. Mount, Ph.D., a clinical psychologist, administered the Million Clinical Multiaxial Inventory (MCMI) and found that Plaintiff's mental status was consistent with the testing in that she was depressed, anxious, and appeared to have a personality disorder. (Tr. 436-454.)  He noted that the testing suggested a schizoaffective disorder, depressed type.  He also found she achieved scores indicating severe depression and anxiety on the Beck inventories and a positive score on the Posttraumatic Stress Disorder Checklist for Civilians.  Dr. Mount diagnosed schizoaffective disorder, depressed type; generalized anxiety disorder; and chronic PTSD.  He also provisionally diagnosed a schizoid personality disorder.  He opined that her GAF score was 40.  (Tr. 438.) Pursuant to American Psychiatric Association criteria, such a score indicates some impairment in

reality testing or communication, or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood.  Examples given are of a depressed individual who avoids friends, neglects family, and is unable to work.[11]

From this extensive testing and the diagnoses of Plaintiff's mental illnesses by Dr. Mount, the ALJ picked and chose that with respect to the MCMI I-III, Plaintiff may have reported more psychological symptoms than objectively exist.  (Tr. 28.)  However, the ALJ left out the rest of Dr. Mount's observation, namely, that "adjustments correcting for this tendency were probably successful in retaining the instrument's validity."  (Tr. 440.)  The ALJ also focused upon the phrase "there may be an exaggeration of current emotional problems" (Tr. 442), leaving out the doctor's conclusion that this may result from the patient's moderate tendency toward self-depreciation and again leaving out that "adjustments correcting for this tendency were probably successful in retaining the instrument's validity."  (Tr. 442.)  Importantly, the ALJ totally disregarded two opinions from examining physicians that Plaintiff was not a malingerer.  Dr. Mount concluded that Plaintiff was not a malingerer, was incapable of even low stress jobs, and would likely be absent from work due to her impairments or treatment, more than three times a month.  (Tr. 454-55.)  Dr. Mount's assessment was consistent with Dr. Cohen's conclusion that "he found no evidence whatsoever of facititious disorder or malingering."  (Tr. 284.)

The ALJ committed the same error with respect to the medical evidence of Dr. Brian P. Skop, pointing out "symptom magnification" and omitting Dr. Skop's report that this could have been due to factors other than an attempt to make herself look worse than she actually is, such as the examinee experiencing distress at the time of test-taking, making a cry for help, or exhibiting severe

---

[11]*See* American Psychiatric Association, <u>DSM-IV</u>, *Id.*

19

psychopathology.  (Tr. 396, 402.)  Dr. Skop warned that Plaintiff may be prone to destroy property and to hurt others, that such risks exist in any potential environment, including the workplace, and that Plaintiff's level of risk to self and others should be further evaluated and frequently and carefully monitored.  (Tr. 30.)  The ALJ discounted the importance of the warnings by juxtaposing the warnings with Dr. Skop's earlier statement that the validity scales point toward a marginally valid, exaggerated MMPI-s profile.  (Tr. 30, 397-98.)  On the other hand, Dr. Skop emphasized that the risks of harm to others are "important to note" and devoted an entire section of his report to "Safety in the Workplace," detailing the risks.  Additionally, the ALJ did not mention Dr. Skop's conclusion that Plaintiff's presentation, psychological testing, and history are suggestive of a personality disorder with Cluster B (antisocial, narcissistic, borderline, and histrionic) traits.  (*Id*.)

The ALJ gave "significant weight" to the psychiatric review technique form completed by Leela Reddy, M.D., who is neither a psychiatrist nor a psychologist.  (Tr. 29.)  Dr. Reddy is a state agency medical consultant who reviewed the medical records.  (*Id*.)  The ALJ gave "some weight" to the mental residual functional capacity assessment completed by Dr. Reddy (*Id*.).  However, Dr. Reddy's opinion in the mental residual functional capacity assessment is inconsistent with her assessment in the psychiatric review technique form.  In the psychiatric review technique form, she reported that Plaintiff has "mild" difficulties in maintaining social functioning and in maintaining concentration, persistence and pace (Tr. 367), while at the same time reporting in the RFC assessment that the Plaintiff has moderate limitations in her ability to maintain attention and concentration for extended periods; to perform activities within a schedule; work in coordination with or proximity to others without either distracting them or being distracted by them; to interact appropriately with the general public; and to perform at a consistent pace.  (Tr. 371-372).  The Court finds that the ALJ's

reliance upon Dr. Reddy's inconsistent assessments created ambiguities, leaving the ALJ's MRFC conclusions unsupported by substantial evidence.

The ALJ also gave "some weight" to the opinion of Dr. Stephenson, a consultative psychologist (Tr. 31). Dr. Stephenson performed intelligence and achievements tests on Plaintiff. (Tr. 457-468.) He diagnosed Plaintiff with posttraumatic stress disorder and major depressive disorder, severe, without psychosis but with an inclusion of suicidal ideations. (Tr. 462.) The ALJ noted that Dr. Stephenson found Plaintiff marked to moderately limited in some areas of ability to understand, remember, and carry out instructions and markedly limited with respect to the ability to interact appropriately with the public, the ability to interact appropriately with supervisors, and the ability to interact appropriately with co-workers. The ALJ also noted that Plaintiff has an extreme limitation with regard to her ability to respond appropriately to work pressures in a usual work setting and to changes in a routine work setting (Tr. 467). However, without citing to evidence in support of this conclusion, the ALJ concluded that Plaintiff's mental health disorders did not preclude work related activities, but rather, just led to some limitations. (Tr. 31.) However, in recognizing limitations in the RFC determination, the ALJ only included the limitation to work that requires only simple routine tasks and to work that requires no more than occasional contact with the general public and coworkers. While giving Dr. Stephenson's opinion "some weight," the ALJ completely failed to explain why Dr. Stephenson's marked limitation on the ability to interact appropriately with supervisors and extreme limitation with regard to her ability to respond appropriately to work pressures in a usual work setting and to changes in a routine work setting were not included in Plaintiff's RFC.

The terms of 20 CFR 404.1527 set forth factors to be considered in weighing medical opinions. These include the length of the treatment relationship, consistency with other opinions, particular expertise of the treating source, supportability and other factors.  The regulation provides that "[w]e will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."   See CFR 404.1527; Newton, 209 F.3d at 456; Greenspan, 38 F.ed at 237.  The ALJ failed to specifically apply these criteria to the medical opinions in this record. Thus, the ALJ's failure to review the examining source opinions according to the criteria of Section 404.1527 and *Newton* warrants remand.  *See Sherman v. Barnhart*, No.  4:01-CV-192-Y, 2001 WL 34373157, at *6 (N.D. Tex. 2001).

"The disability determination or hearing decision must be set forth carefully. The rationale must reflect the sequential evaluation process; describe the weight attributed to the pertinent medical, nonmedical and vocational factors in the case; and reconcile any significant inconsistencies. Reasonable inferences may be drawn, but presumptions, speculations and suppositions should not be substituted for evidence" *See* SSR 86-8.  In this case, the record, read as a whole, does not yield such evidence as would allow a reasonable mind to accept the conclusions reached by the ALJ.  *See Loza*, 219 F.3d at 393.  The Commissioner failed to properly evaluate Plaintiff's medical evidence. Plaintiff was substantially prejudiced because a proper consideration and evaluation of the medical evidence might have resulted in a finding of disability. The decision is the result of legal error and is unsupported by substantial evidence.   This case should be reversed and remanded to the Commissioner for further proceedings.

**<u>Recommendation</u>**

For the foregoing reasons, this Court recommends that the United States District Court **REVERSE** the Commissioner's decision and **REMAND** this case for administrative proceedings consistent with this opinion.

Signed August 27, 2012.

_____
PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

The United States District Clerk shall serve a copy of these findings, conclusions, and recommendation on the parties.  Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions, and recommendation must serve and file written objections within fourteen days after service.  A party filing objections must specifically identify those findings, conclusions, or recommendation to which objections are being made.  The District Court need not consider frivolous, conclusory, or general objections.  A party's failure to file such written objections to these proposed findings, conclusions, and recommendation shall bar that party from a *de novo* determination by the District Court.  *See Thomas v. Arn*, 474 U.S. 140, 150 (1985).  Additionally, any failure to file written objections to the proposed findings, conclusions, and recommendation within fourteen days after service shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error.  *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).